UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NARSAYAH "STANLEY" TOMBY, PAMELA PRESCOTT, MARK HIGHTOWER, MARILYN WILLIAMS, and SERLENA THOMAS-WEATHERINGTON<br>    Plaintiffs,<br><br>v.<br><br>COMMUNITY RENEWAL TEAM, INC., JOSE C. VEGA, JUDY VASQUEZ, and GLORIA PIMENTEL,<br>    Defendants. | 3:09-cv-1596 (CFD) |

## RULING ON MOTION TO DISMISS

On September 3, 2009, Narsayah "Stanley" Tomby,[1] Pamela Prescott, Mark Hightower, Marilyn Williams, and Serlena Thomas-Weatherington (collectively, the "plaintiffs") filed a complaint in Hartford Superior Court alleging discrimination based on disability, race, age, and sex; retaliation; constructive discharge; and negligent and intentional infliction of emotional distress. On October 7, 2009, Community Renewal Team, Inc. ("CRT"), Jose C. Vega, Judy Vasquez, and Gloria Pimentel (collectively, the "defendants") removed the action to this Court based on federal question jurisdiction pursuant to 28 U.S.C. § 1331. The defendants now move to dismiss the plaintiffs' claims of negligent and intentional infliction of emotional distress—Counts Three, Four, Seven, Eight, Eleven, Twelve, Sixteen, Seventeen, Twenty, and Twenty-One—under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the motion to dismiss is granted.

---

[1] On October 7, 2009, after the Complaint in this action was filed, Tomby passed away. The Administratrix of Tomby's estate, Irene C. Olszewski, was substituted as the party plaintiff in this action on February 25, 2010.

**I.     Factual Background**[2]

CRT is an anti-poverty agency located in Hartford, Connecticut. CRT operates many programs to help poor and disadvantaged individuals and families in Connecticut. While each of the plaintiffs were employed by CRT, the basic facts differ for each plaintiff and are set forth below.

A.     Stanley Tomby

Narsayah "Stanley" Tomby began working as a custodian at CRT in 1989 and was later promoted to Operations Manager in 1997. Tomby underwent heart surgery in 2002, causing him to miss about eight weeks of work. When Tomby returned to work, he provided CRT with a physician's note indicating that he could not lift over twenty-five pounds. In 2004, Tomby suffered a stroke and was hospitalized, but again returned to work and resumed his duties as Operations Manager. Tomby continued in this position, in good standing, through May 2008.

In May 2008, defendant Judy Vasquez, a Program Director at CRT, met with Tomby and informed him that he was doing a good job and progressed on all the tasks assigned to him. The next month, in June 2008, CRT hired defendant Gloria Pimentel as a Program Manager. Pimentel subsequently met with Tomby and reported that he was not doing his job sufficiently and stated that she did not want to fire him on her second day as Program Manager. Pimentel subsequently solicited opinions about Tomby's work from other employees and criticized Tomby's work to a degree beyond that which other employees were subjected to. Pimentel also forced Tomby to lift well over twenty-five pounds, despite his medical limitations. Tomby

---

[2] These facts are taken from the allegations of the plaintiffs' complaint. The allegations must be assumed true for the purpose of resolving the motion to dismiss.

submitted multiple written complaints to Human Resources ("HR") regarding Pimentel's conduct towards him. Thereafter, Pimentel allegedly imposed burdensome conditions on Tomby, such as requiring him to notify her of his whereabout at all times. No other employees were subject to such requirements.

On July 14, 2008, Tomby was granted leave pursuant to the FMLA. While on leave, Pimentel asked Tomby to come to her office and she subsequently issued Tomby a third written warning for his excessive absences, despite his being on FMLA leave at the time. About two or three weeks later, Tomby suffered a stroke. Because of his medical condition, Tomby never returned to work and claims that he was constructively discharged.

### B. Pamela Prescott

Pamela Prescott worked at CRT as a Clinical Case Manager from February 15, 2007 to July 24, 2008. Prescott, a Caucasian woman, claims that her supervisors, defendants Jose Vega and Judy Vasquez, harassed her, and discriminated and retaliated against her because she was not Hispanic. Both Vega and Vasquez are of Hispanic descent. Prescott complained to HR on multiple occasions about the ongoing discrimination, but her complaints were rapidly dismissed. Due to her complaints, Prescott was subjected to further retaliation, discrimination, and harassment by Vega and Vasquez. Prescott was also denied a promotion to Program Manager in May 2008—the position instead went to a Hispanic woman who was allegedly less qualified than Prescott. A note on Prescott's promotion application stated that Vasquez believed that Prescott did not have sufficient experience for the position. Prescott filed a grievance regarding CRT's discriminatory hiring practices on July 2, 2008. That same day, Prescott noticed pornography on the computer of another employee who was involved in a romantic relationship with Vasquez.

She also reported the pornography and relationship to HR. The next day, Vasquez verbally threatened Prescott in retaliation for her filing the grievance. Subsequently, Vasquez began criticizing and belittling Prescott in front of her clients. Prescott claims that because of Vasquez's conduct towards her, she was constructively discharged and forced to resign.

C.   Mark Hightower

Hightower worked for CRT in various positions from August 15, 1996 to May 13, 2008, when he was terminated. Hightower claims that Vasquez and Vega harassed him, and discriminated and retaliated against him because he is African American and has polycystic kidney disease. He also claims that he was paid less than other non-African American employees. In addition to alleging overall preferential treatment toward Hispanic-American individuals, Hightower also alleges that he was terminated due to his medical condition. In January 2007, Hightower notified Vega, his supervisor, that he needed a kidney transplant and would need time off for the procedure at some point in the future. Then, in April 2008, Hightower informed Vega that his daughter may be a possible match as a kidney donor and that he expected to need time off in the near future for the transplant surgery. Approximately one month later, Hightower was terminated for violating client confidentiality. Although Hightower attempted to explain that he had followed the appropriate procedures with respect to client confidentiality, CRT apparently failed to investigate whether the procedures had been followed, and instead, terminated his employment.

D.   Marilyn Williams

Marilyn Williams was hired for two part-time positions at CRT in January 2002. Williams was a Case Manager Family Specialist in the Community Housing Assistance Program

("CHAP") and a Life Skills Educator within the Community Life Skills Department ("CLS"). Williams was a certified Life Skills Educator, pursuant to certification by the Department of Children and Families ("DCF"). Williams ran programs for CRT that were paid through the CHAP budget, but she was allegedly told to falsely represent that her students and programs were being run through and with funding from the City of Hartford. Williams questioned and complained about these practices. In May 2008, Williams was transferred from her position with CHAP to a full-time position as a Life Skills Educator in CLS's Youth Services Program.

On July 31, 2008, Williams underwent surgery and was expected to be out on FMLA leave for four to six weeks. On August 15, while still on FMLA leave, Vasquez verbally informed Williams that DCF had changed its required qualifications for Life Skills Educators and consequently, because Williams did not have a bachelor's degree, she would be laid off from CHAP effective August 31, 2008. Williams questioned Vasquez's reason for terminating her, asserting that she no longer worked for CHAP, but Vasquez stated that a bachelor's degree was now required for any Life Skills Educator and told Williams that the decision was made by the "agency." On October 3, 2008, Williams received a termination letter, stating that she had been terminated as Case Manager in the CHAP program.

  E. <u>Serlena Thomas-Weatherington</u>

Serlena Thomas-Weatherington was hired by CRT as a part-time Residential Aide in 1996. In 2000, Thomas-Weatherington was promoted to full-time Case Manager. Judy Vasquez and Jose Vega, both of whom are of Hispanic descent, allegedly displayed openly discriminatory conduct towards Hispanic employees, including Thomas-Weatherington. After being hired by CRT as a Program Manager, Pimentel, also a Hispanic woman, became Thomas-

Weatherington's superior. Together, Vasquez, Vega, and Pimentel consistently harassed Thomas-Weatherington and created a hostile work environment. Specifically, they told clients and other CRT employees that Thomas-Weatherington was not trustworthy; they failed to respond appropriately to the complaints that Thomas-Weatherington filed regarding the hostile work environment; they harassed Thomas-Weatherington with excessive emails and audits of case files; and they called Thomas-Weatherington into work for audits after her work day had ended. Thomas-Weatherington informed CRT in writing about the harassment she was enduring, but CRT did not investigate her complaints. On August 15, 2008, Thomas-Weatherington resigned as a result of the hostile work environment.

## II. Discussion

### A. Motion to Dismiss Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must state a claim for relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal citations omitted). In determining whether the plaintiff has met this standard, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the non-moving party. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).

B.  Negligent Infliction of Emotional Distress

To assert a claim of negligent infliction of emotional distress in the employment context, the unreasonable conduct at issue must arise during the termination process. See Perodeau v. City of Hartford, 792 A.2d 752, 772 (Conn. 2002); Millspaugh v. Conn. Water Serv., Inc., No. 3:07CV871, 2008 WL 906842, at *4 (D. Conn. Mar. 31, 2008). It is neither necessary nor sufficient to find that the termination be "wrongful"; rather, the dispositive issue in each case is whether the defendant's conduct during the termination process is "sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." Perodeau, 792 A.2d at 765 (internal quotations and alterations omitted). "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." Id. Instead, "the employer's conduct must be humiliating, extreme, or outrageous." Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 197 (D. Conn. 2000).

Courts have held that allegations of constructive discharge may qualify as "termination." Presley v. Pepperidge Farm, Inc., 356 F. Supp. 2d 109, 140 (D. Conn. 2005); see also Pecoraro v. New Haven Register, 344 F. Supp. 2d 840, 845 (D. Conn. 2004). But cf. Pinckney v. Miss Porter's Sch., Inc., No. CV085009273S, 2009 WL 1175327, at *4–5 (Conn. Super. Ct. Mar. 30, 2009) (adopting the holdings of two other Connecticut Superior Courts and stating that a claim for negligent infliction of emotional distress in the employment context cannot stand on a claim for "constructive discharge" because "[t]ermination means the ending, not the conduct which causes the ending"). One of the problems with allegations of constructive discharge in this context is "when does the ongoing employment relationship end and the termination process

begin for purposes of determining what events and conduct by the employer may be considered in evaluating a negligent infliction of emotional distress claim." Pecoraro, 344 F. Supp. 2d at 846. In Pecoraro, the court found that the focus should be on the events occurring during the resignation process or once plaintiff terminated her employment. See id. at 847; Presley, 356 F. Supp. 2d at 140 ("In a case of constructive discharge, courts will consider only the incidents which occurred during the plaintiff's resignation process or thereafter."); see also Zittoun v. Ratner Cos., LLC, No. 3:08CV1139, 2009 WL 82509, at *3 (D. Conn. Jan. 12, 2009) (finding that inappropriately "snapping" at the employee on the day of her resignation was not sufficient for purposes of a negligent infliction of emotional distress claim).

*Count Three: Tomby's Allegations Against Pimentel*

Tomby claims that as a result of Pimentel's conduct towards him, he suffered emotional distress, anxiety, and anguish, which ultimately led to his constructive discharge. In particular, Tomby alleges that Pimentel harassed and belittled him, including when Pimentel issued him a warning for excessive absence while he was on FMLA leave. However, Tomby was not terminated and therefore, the Court may only consider actions that occurred during the resignation process. Tomby alleges no conduct that actually occurred during the resignation process; he only claims that Pimentel's actions ultimately lead to his constructive discharge.[3] This distinction has been held to be determinative. Compare Pinckney, 2009 WL 1175327, at *4-5 (striking a claim of negligent infliction of emotional distress because the alleged conduct occurred before the plaintiff's resignation), with Jarrett v. Cmty. Renewal Team, Inc., No.

---

[3] The Complaint does not explicitly allege that Tomby was constructively discharged. However, Tomby never returned to work after going on FMLA leave in July 2008 and passed away in October 2009.

CV020816341S, 2003 WL 1962835, at *5 (Conn. Super. Ct. Apr. 2003) (holding that an allegation of an inconsiderate *termination* was sufficient to withstand a motion to strike a claim for negligent infliction of emotional distress). Accordingly, the defendants' motion to dismiss Count Three is granted.

*Count Seven: Prescott's Allegations Against Vasquez*

Prescott alleges that Vasquez harassed and belittled her because she was not Hispanic, and as a result, Prescott suffered emotional distress. Like Tomby, Prescott was not terminated. Instead, Prescott resigned and therefore only events during or subsequent to the resignation process are relevant to her claim of negligent infliction of emotional distress. Although Prescott resigned three weeks after Vasquez verbally threatened her, that is not sufficiently close in time (nor sufficiently extreme) to support a finding of negligent infliction of emotional distress. See, e.g., Pecoraro, 344 F. Supp. 2d at 847 (finding that an HR representative accusing the plaintiff of making an offensive phone call to her daughter approximately one month before the plaintiff quit was not sufficient to demonstrate negligent infliction of emotional distress). Because Prescott does not allege any unreasonable conduct by Vasquez during the resignation process, the Court grants the defendants' motion to dismiss Count Seven.

*Count Eleven: Hightower's Allegations Against Vega*

Hightower alleges that the manner in which Vega terminated him caused him to suffer emotional distress. Vega told Hightower that he was being terminated for a breach of client confidentiality, but Hightower claims it was because he had notified Vega, one month earlier, that he would likely need time off in the near future for a kidney transplant. "[F]alsely accusing a plaintiff of misconduct or publicizing false reasons for a plaintiff's termination to other

-9-

employees may be sufficiently unreasonable conduct to support a claim of negligent infliction of emotional distress." Battistoni v. Lakeridge Tax Dist., No. LLICV075002223S, 2008 WL 2746080, at *4 (Conn. Super. Ct. June 17, 2008) (internal citations and quotations omitted); see also Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 309 (D. Conn. 2000) (finding that allegations that defendant concocted false accusations about plaintiff's job performance, lied to customers about plaintiff, and attempted to bring about plaintiff's termination were sufficient to survive summary judgment on a negligent infliction of emotional distress claim where plaintiff claimed that he was constructively discharged). However, terminating an employee in bad faith, without more, does not constitute negligent infliction of emotional distress. See Parsons v. United Techs. Corp., Sikorsky Aircraft Div., 700 A.2d 655, 667 (Conn. 1997) ("The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior. (internal quotations and citations omitted)). Cases in which a plaintiff's negligent infliction of emotional distress claim is based on allegations of falsity typically include more unreasonable conduct than the false statement itself. For example, in Protasewich v. Combustion Eng'g, Inc., No. CV 950552146S, 1997 WL 133499, (Conn. Super. Ct. Mar. 7, 1997), the plaintiff alleged that on the day he was terminated, he was escorted by security guards in front of his colleagues, armed security were positioned at all of the exits of the building, there were security vehicles and flashing lights in the parking lot, and the defendants publicly announced to all employees that the plaintiff was terminated for a breach of business ethics. See also Peralta v. Cendant Corp., 123 F. Supp. 2d 65, 82–83 (D. Conn. 2000) (denying

summary judgement on a claim of negligent infliction of emotional distress where the plaintiff's supervisor falsified reviews in order to cause the plaintiff's termination). Here, there is no allegation that Vega publicized Hightower's termination in front of other employees, falsified any documents, or took any unreasonable conduct, other than making a false statement, in the termination process that would humiliate Hightower. Consequently, even if Vega's stated reason for terminating Hightower was pretextual, such improper motivation is not enough to maintain a claim for negligent infliction of emotional distress. Therefore, the defendants' motion to dismiss this count is granted.

*Count Sixteen: Williams' Allegations Against Vasquez*

Williams alleges that she suffered emotional distress, anxiety, and anguish due to Vasquez's conduct in terminating her from CRT. However, the only interaction between Williams and Vasquez alleged in the Complaint occurred when Vasquez verbally informed Williams that DCF had changed its required qualifications for her position and that, as a result, she would be laid off from CHAP. Such an allegation does not rise to the level of extreme, outrageous, or humiliating conduct that is required to sustain a claim for negligent infliction of emotional distress. Courts repeatedly distinguish between motive and conduct—in order to sustain a claim for negligent infliction of emotional distress, there must be unreasonable *conduct*. See Miner, 126 F. Supp. 2d at 195 ("In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous."). Thus, even if Williams was terminated for improper reasons, such termination, without more unreasonable conduct, is insufficient for a claim of negligent infliction of emotional distress. Parsons, 700 A.2d at 667 (Conn. 1997). Accordingly, the Court grants the defendants' motion to dismiss this count.

*Count Twenty: Thomas-Weatherington's Allegations Against Vasquez, Vega, and Pimentel*

Thomas-Weatherington alleges that the defendants discriminated against her based on her race and created a hostile work environment at CRT, which caused her emotional distress and ultimately forced her to resign. As previously discussed, when an employee is not terminated, a court may only consider conduct that occurred in the resignation process for purposes of a negligent infliction of emotional distress claim. Here, Thomas-Weatherington does not allege any improper conduct by any of the defendants during the resignation process. Her allegations of a hostile work environment only pertain to events leading up to her resignation and such allegations are insufficient to withstand a negligent infliction of emotional distress claim. Pinckney, 2009 WL 1175327, at *4–5. Therefore, the Court grants the defendants' motion to dismiss this count.

C. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Bd. of Educ., 757 A.2d 1059, 1063 (Conn. 2000). Whether the defendants' conduct was extreme and outrageous is the initial question for the court to address. Edwards v. New Opportunities Inc., No. 3:05CV1238, 2007 WL 947996, at *7 (D. Conn. Mar. 26, 2007).

> [I]n assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function. In this capacity, the role of the court is to determine whether the

> allegations of a complaint . . . set forth behaviors that a reasonable
> fact finder could find to be extreme or outrageous. In exercising
> this responsibility, the court is not fact finding, but rather is making
> an assessment whether, as a matter of law, the alleged behavior fits
> the criteria required to establish a claim premised on intentional
> infliction of emotional distress.

Tracy v. New Milford Pub. Sch., 922 A.2d 280, 286 (Conn. App. Ct. 2007) (internal quotations omitted). Only if reasonable minds could disagree does it become an issue for the jury to decide. Adams v. Hartford Courant & Tribune Co., No. 303CV0477, 2004 WL 1091728, at *4 (D. Conn. May 14, 2004).

Both federal and state courts in Connecticut have interpreted the qualification of "extreme and outrageous conduct" strictly. Golnik v. Amato, 299 F. Supp. 2d 8, 15–16 (D. Conn. 2003). Liability can only be imposed if the conduct "exceeds all bounds usually tolerated by decent society" and is "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." Buster v. City of Wallingford, 557 F. Supp. 2d 294, 301 (D. Conn. 2008). The suffering must be "so severe that no reasonable person could be expected to endure it." Id. at 302. A "routine employment action, even if made with improper motivations, does not constitute extreme or outrageous behavior." Edwards, 2007 WL 947996, at *7 (internal quotations omitted). Additionally, "insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings" do not reach the standard of offensive conduct. Miner, 126 F. Supp. 2d at 195.

*Count Four: Tomby's Allegations Against Pimentel*

Tomby alleges that Pimentel inflicted emotional distress upon him by unfairly harassing and disciplining him, despite his medical limitations. Although Pimentel repeatedly forced Tomby to exert himself beyond his medical limitations, such action, without more, is not extreme

-13-

or outrageous. Cf. Armstead v. Stop & Shop Cos., Inc., No. 3:01CV1489, 2003 WL 1343245, at *5 (D. Conn. Mar. 17, 2003) (finding that the "[f]ailure to accommodate plaintiff's disability . . . [does] not rise to the level of exceeding all bounds usually tolerated by decent society"). In addition, Tomby claims that Pimentel unreasonably placed tougher demands on him, as compared to other employees, and monitored him more closely. A supervisor's strict control of an employee, however, does not exceed the bounds of decency. See Padula v. Weston, No. CV064014462S, 2006 WL 3042660, at *8 (Conn. Super. Ct. Oct. 16, 2006) ("Individuals reasonably should expect to be subject to routine employment-related conduct, including performance evaluation, both formal and informal, decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance, and disciplinary or investigatory action arising from actual or alleged employee misconduct." (internal quotations and citations omitted)). Further, Tomby alleges that Pimentel intended to cause him emotional distress by forcing him to come to her office while he was on FMLA leave. But courts have held that terminating an employee, who is presently suffering from a medical ailment, does not constitute extreme or outrageous conduct. See id. at *8–9 (striking a claim for intentional infliction of emotional distress where employer terminated an employee known to have a history of anxiety, depression, heart palpitations, and high blood pressure); Randall v. Halloran & Sage, No. CV940533629, 1995 WL 80025, at *3 (Conn. Super. Ct. Feb. 14, 1995) (finding that the length of time between the plaintiff's heart attack and his termination, three years, "is too remote to impute an intentional scheme on the part of the defendants designed to take advantage of the plaintiff's physical susceptibilities"); see also Cox v. Keystone Carbon Co.,

861 F.2d 390, 396 (3rd Cir. 1988) (finding that terminating an employee on the day he returned to work after triple bypass surgery did not constitute extreme and outrageous conduct). Here, Tomby was not terminated when Pimentel called him into her office—he was just issued a warning. If terminating an ill employee is not extreme or outrageous, it cannot be extreme or outrageous to issue an excessive absence warning to an employee on FMLA leave. Because none of Tomby's allegations against Pimentel rise to the extreme level required to maintain a claim for intentional infliction of emotional distress in the workplace, the defendants' motion to dismiss this count is granted.

*Count Eight: Prescott's Allegations Against Vasquez*

Prescott alleges that Vasquez allegedly threatened her because of her race and then began belittling her in front of clients. This conduct, however, is not extreme or outrageous. For example, in Williams v. Deloitte Servs., LP, No. 3:09CV17, 2009 WL 3571365 (D. Conn. Oct. 26, 2009), this Court held that allegations of failure to promote, preferential treatment for white employees, harassment, threats, and being singled out and embarrassed in front of fellow employees was not sufficient to constitute extreme or outrageous conduct for purposes of a motion to dismiss. See also Lorenzi v. Conn. Judicial Branch, 620 F. Supp. 2d 348, 353 (D. Conn. 2009) (dismissing a claim for intentional infliction of emotional distress where the defendants allegedly discriminated against an employee on the basis of race and/or national origin and retaliated against the employee for complaining against such discrimination). Here, Vasquez allegedly threatened and disparaged Prescott because she was not Hispanic. The totality of the conduct in Williams was much more severe than the harassment that Prescott alleges Vasquez engaged in. Accordingly, the defendants' motion to dismiss this count is granted.

*Count Twelve: Hightower's Allegations Against Vega*

Hightower alleges that Vega intended to cause him emotional distress by terminating him after he informed her that he needed time off from work for an upcoming surgery, and providing a false reason for such termination. Hightower initially notified Vega of his medical condition in January 2007 but was not terminated until May 2008. Although Hightower was terminated only a few weeks after notifying Vega that he would need more disability time for his upcoming surgery, he does not allege any extreme or outrageous *conduct*. Instead, Hightower merely claims that Vega made a false statement to him in the termination process when she told him he was being terminated due to a breach of client confidentiality. Courts have repeatedly held that routine employment action, even if conducted in bad faith, does not constitute extreme or outrageous behavior. See Edwards, 2007 WL 947996, at *7. Consequently, the defendants' motion to dismiss this count is granted.

*Count Seventeen: Williams' Allegations Against Vasquez*

Like Prescott, Williams alleges that due to her race, Vasquez belittled, harassed, threatened, and intimidated her. As previously discussed, courts have held that such actions in the workplace, without more severe conduct, is not actionable under this tort. See Williams, 2009 WL 3571365, at *2–3; Lorenzi, 620 F. Supp. 2d at 353 . Therefore, the defendants' motion to dismiss this count is granted.

*Count Twenty-One: Thomas-Weatherington's Allegations Against Vasquez, Vega, and Pimentel*

Like Prescott and Williams, Thomas-Weatherington alleges that she was discriminated against on the basis of race and that Vasquez, Vega, and Pimentel intentionally inflicted emotional distress on her. Specifically, Thomas-Weatherington alleges that she was subjected to

verbal harassment, a hostile work environment, and a disproportionate work load. None of the alleged conduct, individually or in the aggregate, constitutes extreme and outrageous conduct sufficient to be actionable under this tort. "Merely alleging a hostile work environment or verbal harassment does not suffice to make out a claim for intentional infliction of emotional distress, even at the pleading stage." Sousa v. Roque et al., No. 3-05CV822, 2005 WL 3543721, at *4 (D. Conn. Dec. 16, 2005) (citing Knight v. Se. Council on Alcoholism, No. 557182, 2001 WL 1231825, at *3–5 (Conn. Super. Ct. Sept. 24, 2001). Verbal harassment, such as questioning Thomas-Weatherington's trustworthiness in front of others, is not sufficiently extreme or outrageous. See Appleton, 757 A.2d at 1063 (reviewing summary judgment, the court found that making condescending comments about a teacher in front of her colleagues was not so "atrocious" enough to form the basis of an action for intentional infliction of emotional distress). Further, discrimination based on race and retaliation against an employee for filing complaints about such racial discrimination does not rise to the level of sufficiently egregious behavior necessary to maintain a claim for intentional infliction of emotional distress. Lorenzi, 620 F. Supp. 2d at 353. Finally, a disproportionate work load, even if in retaliation, is not actionable under an intentional infliction of emotional distress claim. See Moore v. Mara, No. 3:08CV1946, 2010 WL 3270223, at *7 (D. Conn. Aug. 17, 2010) (holding that forcing an employee to work overtime, among other things, is not extreme and outrageous conduct). Accordingly, the defendants motion to dismiss this count is granted.

### III. Conclusion

Accordingly, the defendants' motion to dismiss Counts Three, Four, Seven, Eight, Eleven, Twelve, Sixteen, Seventeen, Twenty, and Twenty-One of the Complaint [Dkt # 26] is GRANTED.

SO ORDERED this 15th day of December 2010, at Hartford, Connecticut.

                                                    Christopher F. Droney
                                                    **CHRISTOPHER F. DRONEY**
                                                    **UNITED STATES DISTRICT JUDGE**